UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DIANA DYER,

      Plaintiff,

v.                       Case No. 8:24-cv-2867-VMC-SPF

COLOPLAST CORP. and COLOPLAST
MANUFACTURING US, LLC,

      Defendants.

_____/

## ORDER

This matter is before the Court on consideration of Defendant Coloplast Corp.'s ("Coloplast") Motion to Exclude Expert Opinions of Jimmy Mays, Ph.D. (Doc. # 91), filed on April 15, 2026. Plaintiff Diana Dyer responded on May 6, 2026. (Doc. # 119). The Motion is granted in part and denied in part.

## I.   Background

In December 2020, Ms. Dyer "was surgically implanted with an Aris™ Trans-Obturator Sling System (hereinafter the 'Aris'), a pelvic mesh product and medical device designed, manufactured, and marketed by Defendants," which "was intended to treat pelvic organ prolapse and stress urinary incontinence." (Doc. # 1 at 1). Ms. Dyer alleges that neither she "nor her healthcare providers were warned that the Aris

1

was defective and negligently designed and manufactured." (Id. at 1-2). Ms. Dyer claims that she "has suffered, and continues to suffer, debilitating injuries" "[a]s a result of being surgically implanted with Defendants' unreasonably dangerous defective pelvic mesh device." (Id. at 2).

Ms. Dyer initiated this action to recover damages for her claimed injuries. (Id.). In the complaint, Ms. Dyer asserts three causes of action: (1) negligence, (2) strict liability design defect, and (3) strict liability failure to warn. (Id. at 33-47).

The case then proceeded through discovery. Ms. Dyer retained as an expert Dr. Jimmy Mays, a "Professor Emeritus in the Department of Chemistry at the University of Tennessee." (Doc. # 125-3 at 1-2). Dr. Mays has a Ph.D. in polymer science and has "worked extensively in the area of polymeric biomaterials." (Id. at 2).

Dr. Mays offers the following opinions: (1) "polypropylene is susceptible to oxidation and it degrades by an oxidative mechanism in the body"; (2) "all polypropylene transvaginal mesh implants will degrade in vivo"; (3) "[t]he polypropylene resin used by Coloplast to make all their pelvic repair meshes is susceptible to oxidative degradation"; (4) "[f]oreign body reaction to the mesh in vivo leads to

oxidation, chain scission, reduction in molecular weight, embrittlement, degradation, flaking, pitting, and cracking"; (5) the mesh "cannot function properly after implantation, which can lead to adverse events in an implantee"; (6) polypropylene mesh's properties change *in vivo,* "creating a mechanical mismatch with surrounding soft tissue and preventing the mesh from functioning in the manner in which it was intended to function"; and (7) "[s]tudies on Coloplast polypropylene mesh oxidative degradation *in vivo* have revealed that polypropylene microparticles and nanoparticles are produced and released into surrounding tissue." (<u>Id.</u> at 6-7). Accordingly, Dr. Mays opines that the Aris is not suitable to serve as a permanent implant. (<u>Id.</u> at 7).

Now, Coloplast moves to exclude the opinions of Dr. Mays. (Doc. # 91). Ms. Dyer has responded. (Doc. # 119). The Motion is ripe for review.

## II.  <u>Legal Standard</u>

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Implementing Rule 702, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), requires district courts to ensure that any scientific testimony or evidence admitted is both relevant and reliable. See Id. at 589-90. District courts must conduct this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005).

The Eleventh Circuit "requires trial courts acting as gatekeepers to engage in a 'rigorous three-part inquiry.'" Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1194 (11th Cir. 2010). The district court must assess whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

4

Id. The proponent of the expert testimony must show, by a preponderance of the evidence, that the testimony satisfies each requirement. Id.

## III.  **Analysis**

Coloplast challenges the admissibility of Dr. Mays's opinions on: (1) oxidative degeneration, (2) clinical complications associated with polypropylene mesh, (3) the reduction of mechanical properties of polypropylene mesh *in vivo*, (4) the toxicity or irritability of polypropylene resin or antioxidants, and (5) safer alternatives to polypropylene mesh. Coloplast also asks the Court to preclude Dr. Mays from offering legal conclusions, summarizing Coloplast's internal documents, or opining on Coloplast's state of mind and conduct. The Court addresses each contention in turn.

### A.    **Oxidative Degradation Opinions**

Dr. Mays opines that polypropylene mesh undergoes oxidative degradation in the human body, which causes the mechanical properties of the mesh to break down. (Doc. # 125-3 at 9-15). Dr. Mays states that "when a foreign object is implanted into living tissue, an inflammatory response occurs resulting in attack on the foreign body by enzymes." (Id. at 12). According to Dr. Mays, this "foreign body reaction" causes degradation of polypropylene mesh implanted in living

5

organisms. (Id. at 13-14). Dr. Mays states that the inflammation caused by the foreign body reaction "leads to enhanced fibrosis, stiffness, erosion of adjacent organs, nerve entrapment, and pain." (Id. at 14) (internal quotation marks omitted).

### 1.    Relevance and Helpfulness to Jury

Coloplast argues that Dr. Mays's opinions are "irrelevant and unhelpful because there is no evidence that [Ms. Dyer's] Aris implant degraded or that any purported degradation caused her alleged injuries." (Doc. # 91 at 6). Coloplast notes that Ms. Dyer's "specific and general causation medical expert, Neeraj Kohli, M.D., does not offer the opinion that [her] Aris implant degraded or that degradation of the Aris implant caused her injuries." (Id.). In response, Ms. Dyer asserts that there is evidence in the record that the Aris's mesh "was defective and that safer alternatives would have mitigated the complications of the 'excessive and unpredictable' foreign body response experienced by Ms. Dyer, even if Dr. Kohli did not specifically utilize the term 'degrade' or refer to 'oxidizing agents.'" (Doc. # 119 at 4-5). The Court agrees with Ms. Dyer and finds Dr. Mays's testimony relevant and helpful to the jury.

6

Expert testimony must assist the trier of fact. Fed. R. Evid. 702. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." United States v. Frazier, 387 F.3d 1244, 1262 (citation omitted). "[T]he court must ensure that the proposed expert testimony is relevant to the task at hand, . . . i.e., that it logically advances a material aspect of the proposing party's case." Allison v. McGhan, 184 F.3d 1300, 1312 (11th Cir. 1999) (internal quotation marks omitted). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63 (citation omitted).

Although Dr. Kohli does not use the word "degradation" in his case-specific report, he opines that implantation of polypropylene mesh causes chronic inflammation and the foreign body response. (Doc. # 119-3 at 12). Dr. Kohli states that "[t]he chronic pain syndromes of polypropylene mid-urethral slings occur either acutely following implantation or months to years later related to the chronic inflammatory response of the foreign body response to polypropylene that may be excessive, unpredictable, and lead to mesh shrinkage

7

or contraction of soft tissues adjacent to the mesh that may be excessive." (Id. at 8). Dr. Kohli opines that PVDF mesh slings are safer alternative devices because "PVDF does not appear to shrink, has improved biocompatibility compared with polypropylene as it has less chronic inflammatory response and fibrosis." (Id. at 10). Dr. Kohli further opines that Ms. Dyer's "vaginal/groin pain . . . is the direct result of the" Aris's defects described throughout his report, including the use of polypropylene mesh, and that "one of the safer alternative devices/procedures not using mesh or avoiding the transobturator space would have reduced the risk of these complications." (Id. at 32). Dr. Mays, in turn, opines that the foreign body reaction causes oxidative degeneration of the mesh and explains the effects of polypropylene degradation *in vivo*. (Doc. # 125-3 at 12–17).

To succeed on any of her claims, Ms. Dyer must prove that the Aris "is defective or unreasonably dangerous." Brown v. DePuy Orthopaedics, Inc., 978 F. Supp. 2d 1266, 1272 (M.D. Fla. 2013). The Court agrees with Ms. Dyer that Dr. Mays's opinions are relevant and "helpful to the jury's understanding of what, specifically, about the properties of the Aris mesh leads to the characteristic breakdown, erosion, and scarring of surrounding tissues which Dr. Kohli opines

8

are common complications of the Aris." (Doc. # 119 at 7). This information is "beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262 (citation omitted). Thus, Dr. Mays's opinions would be helpful to the jury.

Coloplast further claims that Dr. Kohli "admit[ted]" in another cause that he "does not believe polypropylene degrades in the human body at all." (Doc. # 91 at 6). However, Dr. Kohli's testimony was that he does not "believe that polypropylene is a degradative product *which creates toxins in the body*." (Doc. # 91-2 at 280:14-16) (emphasis added). In any event, to the extent Dr. Kohli's testimony is contradictory to Dr. Mays's opinions, this goes to the weight rather than the admissibility of the evidence. See Souder v. Floyd Cnty., No. CIV.A. 4:03CV0085HLM, 2005 WL 6218033, at *6 (N.D. Ga. Mar. 22, 2005) ("[C]ontrary evidence goes not to the admissibility of the expert testimony; rather, it goes to the weight of that testimony.").

The Motion is denied as to this issue.

### 2.   Reliability

Next, Coloplast argues that Dr. Mays's degradation opinions are unreliable because Dr. Mays fails to adequately address scientific literature that "demonstrates that the 'cracked' surfaces of explanted polypropylene mesh, which

9

were previously assumed to be degradation of the polypropylene, are in fact a layer of biological material that is deposited on the implant." (Doc. # 91 at 7). The Court is not persuaded.

Dr. Mays thoroughly addresses the studies in question, referred to as the "Thames papers," but ultimately disagrees with their conclusions. (Doc. # 125-3 at 30-42). As another court in this District has held, "[t]o the extent [Coloplast] disagrees with Dr. Mays's rejection of Thames, such disagreement goes to the weight of his opinion and is more appropriately addressed on cross-examination." Redding v. Coloplast Corp., No. 6:19-cv-1857-CEM-GJK, 2022 WL 20829230, at *6 (M.D. Fla. Mar. 26, 2022); see also Bayless v. Boston Sci. Corp., No. 6:20-cv-831-RBD-DCI, 2020 WL 10058191, at *4 (M.D. Fla. Dec. 7, 2020) ("Other scientific literature that may contradict an expert's well-founded opinions is certainly fertile ground for cross-examination. But the Court will not make a credibility determination as to which scientific opinions to believe or disbelieve, which studies to credit or not — that is for the jury to decide.").

Alternatively, Coloplast argues that Dr. Mays lacks a reliable basis to opine that Coloplast's polypropylene mesh implants degrade in the body. (Doc. # 91 at 11-20). In this

10

regard, Coloplast contends that Dr. Mays's opinion is based on two "unfounded, stacked assumptions": "(1) that degradation results from aspects of the [foreign body response] which continuously generate high concentrations of oxidizing agents for the entire life of the implant; and (2) that eventually these oxidizing agents exhaust the antioxidant stabilizers included in Coloplast's surgical mesh implants." (Id. at 13). The Court disagrees.

First, Coloplast argues that Dr. Mays "lacks the qualifications and a reliable basis to assert that the human body continues to release oxidants for the entire life of the mesh implant." (Id.). As to qualifications, Dr. Mays has extensive educational and clinical experience in polymer science and biomaterials. (Doc. # 125-3 at 1-4). As other courts have determined, "Dr. Mays is qualified to opine as to polypropylene generally and the effects of oxidation on polypropylene, which includes the foreign body response to polypropylene." Redding, 2022 WL 20829230, at *2; see also Boneta v. Am. Med. Sys., Inc., No. 20-CIV-60409-RAR, 2021 WL 6134790, at *5 (S.D. Fla. Sept. 27, 2021) ("Dr. Mays holds a Ph.D. in polymer science and has conducted extensive research in the field of biomaterials and developed new biomaterials for medical applications, among other qualifications. Dr.

11

Mays, therefore, may opine on polypropylene oxidation and degradation in the body."); Nunez v. Coloplast Corp., No. 19-cv-24000, 2020 WL 2315077, at *3 (S.D. Fla. May 11, 2020) (finding Dr. Mays qualified to offer opinions on "the effects of polypropylene mesh in the human body").

As to reliability, Coloplast argues that Dr. Mays's "assumption that the [foreign body response] releases high concentrations of oxidants for the life of the implant" is not supported by the "*Biomaterials Science* text." (Doc. # 91 at 14). As previously discussed, "[o]ther scientific literature that may contradict an expert's well-founded opinions is certainly fertile ground for cross-examination" but does not warrant exclusion of expert testimony. Bayless, 2020 WL 10058191, at *4). Coloplast has not demonstrated that Dr. Mays's opinion is unreliable as Dr. Mays has cited multiple other scientific texts in support. (Doc. # 125-3 at 12-15). See Redding, 2022 WL 20829230, at *3 (declining to exclude Dr. Mays's opinion that "the release of oxidating agents in response to a foreign body is continuous for as long as the mesh product remains implanted" despite Coloplast's assertion that it was contradicted by new scientific literature); Nunez, 2020 WL 2315077, at *4 (same). This is an issue to be addressed in cross-examination.

12

Second, Coloplast challenges the reliability of Dr. Mays's opinion that antioxidants added to the polypropylene mesh used in the Aris "cannot permanently protect these mesh products from *in vivo* oxidation." (Doc. # 125-3 at 20; Doc. # 91 at 17-20). Specifically, Coloplast argues that the opinion is unreliable because Dr. Mays relies on a study "regarding the purported in vivo degradation of surgical mesh implants" manufactured by another company, which was published prior to the first Thames paper. (Id. at 17). "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1345 (11th Cir. 2003). However, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Here, Dr. Mays cites many scientific studies to support his opinion that the addition of antioxidants may delay but cannot prevent the oxidative degradation of polypropylene mesh. (Doc. # 125-3 at 17). Coloplast has not demonstrated that there is too great an analytical gap between the studies Dr. Mays cited and his opinion regarding the Aris's polypropylene mesh.

The Motion is denied as to this issue.

### B.    Clinical Complications

Coloplast argues that Dr. Mays "lacks the necessary qualifications to offer opinions concerning potential clinical complications resulting from the purported degradation because he is not a medical doctor and has no medical training." (Doc. # 91 at 20). In response, Ms. Dyer represents that Dr. Mays will not opine on the medical complications associated with polypropylene mesh. (Doc. # 119 at 21). Accordingly, this issue is moot.

### C.    Reduction of Mechanical Properties

Dr. Mays states that the degradation of polypropylene *in vivo* is "accompanied by a decrease in mechanical properties (embrittlement, loss of mass, decreased melting temperature, reduced compliance) of the polypropylene." (Doc. # 125-3 at 46). According to Dr. Mays, "[s]tiffening or reduced compliance of the polypropylene mesh upon degradation has important implications on the intended performance of the mesh as a biomaterial." (Id. at 48).

Coloplast notes that Dr. Mays admittedly "is not qualified to quantify the degree of stiffness purportedly resulting from oxidative degradation in vivo or the degree of stiffness necessary to produce clinical symptoms in a

14

patient, and he is unaware of any scientific literature attempting to do so." (Doc. # 91 at 21). Coloplast asserts that Dr. Mays "has never performed any test or seen any test result on Coloplast's Aris implant indicating that it had a loss of mechanical properties after being implanted in vivo." (Id.). Accordingly, Coloplast argues that Dr. Mays "lacks any reliable basis to opine that Coloplast's surgical mesh implants will stiffen as a result of oxidative degradation or that the degree of the purported stiffening is sufficient . . . to produce clinical complications." (Id.).

As previously discussed, Ms. Dyer represents that Dr. Mays will not offer opinions regarding clinical complications associated with polypropylene mesh. (Doc. # 119 at 21). Accordingly, Coloplast's challenge to the reliability of Dr. Mays's opinion regarding clinical complications of stiffened mesh is moot.

Dr. Mays, an expert in polymer science and biomaterials, cites multiple scientific articles in support of his opinions regarding the reduction of the mesh's mechanical properties. (Doc. # 125-3 at 48-50). The Court finds that Dr. Mays's opinions on this issue are reliable. See Arevalo v. Coloplast Corp., No. 3:19-cv-3577-TKW-MJF, 2020 WL 3958505, at *8 (N.D. Fla. July 7, 2020), aff'd sub nom. Arevalo v. Mentor Worldwide

15

LLC, No. 21-11768, 2022 WL 16753646 (11th Cir. Nov. 8, 2022). (finding Dr. Mays's opinion reliable "because even though Dr. Mays admitted that he could not cite a published paper specifically finding a loss of tensile strength in explanted implants as a result of *in vivo* conditions, his opinion that oxidative degradation results in loss of mechanical properties was the product of a reliable methodology since he relied on his experience and various published papers").

The Motion is denied as to this issue.

### D.    **Toxicology Opinions**

Coloplast argues that Dr. Mays "is unqualified to opine on the alleged toxicity or irritability of polypropylene resin or antioxidants." (Doc. # 91 at 22). In response, Ms. Dyer represents that "Dr. Mays will not opine as to the toxicity of polypropylene resin or antioxidants." (Doc.# 119 at 22-23). Accordingly, the issues of whether Dr. Mays is qualified to offer opinions on toxicity and whether his opinions are reliable and helpful to the jury are moot.

However, Ms. Dyer does not address the issue of whether Dr. Mays is qualified to testify as to the alleged irritability of polypropylene resin or antioxidants. Accordingly, the Court treats this portion of the Motion as unopposed. See Jones v. Bank of Am., N.A., 564 F. App'x 432,

16

434 (11th Cir. 2014) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed."). The Court grants the Motion to the extent of excluding Dr. Mays's opinions on the alleged irritability of polypropylene resin or antioxidants.

### E.    <u>Safer Alternatives</u>

Coloplast argues that Dr. Mays "lacks both the qualifications and the necessary data to opine that polyethylene, poly(vinylidene fluoride) (PVDF), and P4HB meshes" are safer alternatives to polypropylene mesh. (Doc. # 91 at 23). In response, Ms. Dyer represents that Dr. Mays will not opine as to whether PVDF or P4HB is "safer" than polypropylene mesh. (Doc. # 119 at 24). Accordingly, Coloplast's argument regarding PVDF and P4HB mesh is moot. As Ms. Dyer does not address Coloplast's contention that Dr. Mays is not qualified to opine that polyethylene mesh is a safer alternative to polypropylene mesh, the Court treats this portion of the Motion as unopposed. <u>Jones</u>, 564 F. App'x at 434.

The Court grants the Motion to the extent of excluding Dr. Mays's opinion that polyethylene mesh is a safer alternative to polypropylene mesh.

17

**F.   Legal Conclusions, Contents of Internal Documents, and Opinions on Coloplast's State of Mind and Conduct**

Finally, Coloplast asks the Court to exclude Dr. Mays's legal conclusions, summaries of internal documents, and opinions on Coloplast's state of mind or corporate conduct. (Doc. # 91 at 25). In response, Ms. Dyer represents that "Dr. Mays will not offer opinions on Coloplast's state of mind or corporate conduct, nor will he offer any legal conclusions." (Doc. # 119 at 25). However, Ms. Dyer asserts that "Dr. Mays will testify about any documents, including corporate documents, that form the basis for his admissible opinions." (Id.). Ms. Dyer argues that the Court should deny the Motion to the extent Coloplast seeks "to exclude the bases for" Dr. Mays's opinions or "his non-legal conclusions." (Id.). The Court agrees with Ms. Dyer.

The Motion is denied as moot to the extent Coloplast seeks to preclude Dr. Mays from offering legal conclusions or opining on Coloplast's state of mind or corporate conduct. Dr. Mays "is not precluded from offering testimony that uses terms that do not have a separate, distinct, and specialized meaning in the law." Warren v. C. R. Bard, Inc., No. 8:19-

18

cv-2657-TPB-JSS, 2020 WL 3567299, at *4 (M.D. Fla. July 1, 2020).

The Motion is granted to the extent Coloplast asks the Court to "preclude Dr. Mays from testifying as to the content of Coloplast's internal documents." (Doc. # 91 at 25); see Salinero v. Johnson & Johnson, No. 1:18-cv-23643-UU, 2019 WL 7753453, at *18 (S.D. Fla. Sept. 5, 2019) ("[S]imply parroting documents or other testimony does nothing to assist the trier of fact."). However, Dr. Mays "may testify as to a review of internal corporate documents solely for the purpose of explaining the basis for his or her opinions — assuming the opinions are otherwise admissible." Redding, 2020 WL 13882977, at *7 (internal quotation marks omitted).

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Coloplast Corp.'s Motion to Exclude Expert Opinions of Jimmy Mays, Ph.D. (Doc. # 91) is **GRANTED** in part and **DENIED** in part.

(2) Dr. Mays may not offer opinions regarding: (1) the alleged irritability of polypropylene resin or antioxidants or (2) polyethylene mesh as a safer alternative to polypropylene mesh. Dr. Mays also may not summarize Coloplast's internal documents.

19

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 2nd

day of July, 2026.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE